Justice KENNEDY delivered the opinion of the Court.
The Court is asked once again to consider whether the race-conscious admissions program at the University of Texas is lawful under the Equal Protection Clause.
I
The University of Texas at Austin (or University) relies upon a complex system of admissions that has undergone significant evolution over the past two decades. Until 1996, the University made its admissions decisions primarily based on a measure called "Academic Index" (or AI), which it calculated by combining an applicant's SAT score and academic performance in high school. In assessing applicants, preference was given to racial minorities.
In 1996, the Court of Appeals for the Fifth Circuit invalidated this admissions system, holding that any consideration of race in college admissions violates the Equal Protection Clause. See Hopwood v. Texas, 78 F.3d 932, 934-935, 948.
One year later the University adopted a new admissions policy. Instead of considering race, the University began making admissions decisions based on an applicant's AI and his or her "Personal Achievement Index" (PAI). The PAI was a numerical score based on a holistic review of an application. Included in the number were the applicant's essays, leadership and work experience, extracurricular activities, community service, and other "special characteristics" that might give the admissions committee insight into a student's background. Consistent with Hopwood, race was not a consideration in calculating an applicant's AI or PAI.
The Texas Legislature responded to Hopwood as well. It enacted H.B. 588, commonly known as the Top Ten Percent Law. Tex. Educ.Code Ann. § 51.803 (West Cum. Supp. 2015). As its name suggests, the Top Ten Percent Law guarantees college admission to students who graduate from a Texas high school in the top 10 percent of their class. Those students may choose to attend any of the public universities in the State.
The University implemented the Top Ten Percent Law in 1998. After first admitting any student who qualified for admission under that law, the University filled the remainder of its incoming freshman class using a combination of an applicant's AI and PAI scores-again, without considering race.
The University used this admissions system until 2003, when this Court decided the companion cases of Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304, and Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257. In Gratz, this Court struck down the University of Michigan's undergraduate system of admissions, which at the time allocated predetermined points to racial minority candidates. See 539 U.S., at 255, 275-276, 123 S.Ct. 2411. In Grutter, however, the Court upheld the University of Michigan Law School's system of holistic review-a system that did not mechanically assign points but rather treated race as a relevant feature within the broader context of a candidate's application. See 539 U.S., at 337, 343-344, 123 S.Ct. 2325. In upholding this nuanced use of race, Grutter implicitly overruled Hopwood 's categorical prohibition.
In the wake of Grutter, the University embarked upon a year-long study seeking to ascertain whether its admissions policy was allowing it to provide "the educational benefits of a diverse student body ... to *2206 all of the University's undergraduate students." App. 481a-482a (affidavit of N. Bruce Walker ¶ 11 (Walker Aff.)); see also id., at 445a-447a. The University concluded that its admissions policy was not providing these benefits. Supp. App. 24a-25a.
To change its system, the University submitted a proposal to the Board of Regents that requested permission to begin taking race into consideration as one of "the many ways in which [an] academically qualified individual might contribute to, and benefit from, the rich, diverse, and challenging educational environment of the University." Id., at 23a. After the board approved the proposal, the University adopted a new admissions policy to implement it. The University has continued to use that admissions policy to this day.
Although the University's new admissions policy was a direct result of Grutter, it is not identical to the policy this Court approved in that case. Instead, consistent with the State's legislative directive, the University continues to fill a significant majority of its class through the Top Ten Percent Plan (or Plan). Today, up to 75 percent of the places in the freshman class are filled through the Plan. As a practical matter, this 75 percent cap, which has now been fixed by statute, means that, while the Plan continues to be referenced as a "Top Ten Percent Plan," a student actually needs to finish in the top seven or eight percent of his or her class in order to be admitted under this category.
The University did adopt an approach similar to the one in Grutter for the remaining 25 percent or so of the incoming class. This portion of the class continues to be admitted based on a combination of their AI and PAI scores. Now, however, race is given weight as a subfactor within the PAI. The PAI is a number from 1 to 6 (6 is the best) that is based on two primary components. The first component is the average score a reader gives the applicant on two required essays. The second component is a full-file review that results in another 1-to-6 score, the "Personal Achievement Score" or PAS. The PAS is determined by a separate reader, who (1) rereads the applicant's required essays, (2) reviews any supplemental information the applicant submits (letters of recommendation, resumes, an additional optional essay, writing samples, artwork, etc.), and (3) evaluates the applicant's potential contributions to the University's student body based on the applicant's leadership experience, extracurricular activities, awards/honors, community service, and other "special circumstances."
"Special circumstances" include the socioeconomic status of the applicant's family, the socioeconomic status of the applicant's school, the applicant's family responsibilities, whether the applicant lives in a single-parent home, the applicant's SAT score in relation to the average SAT score at the applicant's school, the language spoken at the applicant's home, and, finally, the applicant's race. See App. 218a-220a, 430a.
Both the essay readers and the full-file readers who assign applicants their PAI undergo extensive training to ensure that they are scoring applicants consistently. Deposition of Brian Breman 9-14, Record in No. 1: 08-CV-00263, (WD Tex.), Doc. 96-3. The Admissions Office also undertakes regular "reliability analyses" to "measure the frequency of readers scoring within one point of each other." App. 474a (affidavit of Gary M. Lavergne ¶ 8); see also id., at 253a (deposition of Kedra Ishop (Ishop Dep.)). Both the intensive training and the reliability analyses aim to ensure that similarly situated applicants are being treated identically regardless of which admissions officer reads the file.
*2207 Once the essay and full-file readers have calculated each applicant's AI and PAI scores, admissions officers from each school within the University set a cutoff PAI/AI score combination for admission, and then admit all of the applicants who are above that cutoff point. In setting the cutoff, those admissions officers only know how many applicants received a given PAI/AI score combination. They do not know what factors went into calculating those applicants' scores. The admissions officers who make the final decision as to whether a particular applicant will be admitted make that decision without knowing the applicant's race. Race enters the admissions process, then, at one stage and one stage only-the calculation of the PAS.
Therefore, although admissions officers can consider race as a positive feature of a minority student's application, there is no dispute that race is but a "factor of a factor of a factor" in the holistic-review calculus. 645 F.Supp.2d 587, 608 (W.D.Tex.2009). Furthermore, consideration of race is contextual and does not operate as a mechanical plus factor for underrepresented minorities. Id., at 606 ("Plaintiffs cite no evidence to show racial groups other than African-Americans and Hispanics are excluded from benefitting from UT's consideration of race in admissions. As the Defendants point out, the consideration of race, within the full context of the entire application, may be beneficial to any UT Austin applicant-including whites and Asian-Americans"); see also Brief for Asian American Legal Defense and Education Fund et al. as Amici Curiae 12 (the contention that the University discriminates against Asian-Americans is "entirely unsupported by evidence in the record or empirical data"). There is also no dispute, however, that race, when considered in conjunction with other aspects of an applicant's background, can alter an applicant's PAS score. Thus, race, in this indirect fashion, considered with all of the other factors that make up an applicant's AI and PAI scores, can make a difference to whether an application is accepted or rejected.
Petitioner Abigail Fisher applied for admission to the University's 2008 freshman class. She was not in the top 10 percent of her high school class, so she was evaluated for admission through holistic, full-file review. Petitioner's application was rejected.
Petitioner then filed suit alleging that the University's consideration of race as part of its holistic-review process disadvantaged her and other Caucasian applicants, in violation of the Equal Protection Clause. See U.S. Const., Amdt. 14, § 1 (no State shall "deny to any person within its jurisdiction the equal protection of the laws"). The District Court entered summary judgment in the University's favor, and the Court of Appeals affirmed.
This Court granted certiorari and vacated the judgment of the Court of Appeals, Fisher v. University of Tex. at Austin, 570 U.S. ----, 133 S.Ct. 2411, 186 L.Ed.2d 474 (2013) (Fisher I ), because it had applied an overly deferential "good-faith" standard in assessing the constitutionality of the University's program. The Court remanded the case for the Court of Appeals to assess the parties' claims under the correct legal standard.
Without further remanding to the District Court, the Court of Appeals again affirmed the entry of summary judgment in the University's favor. 758 F.3d 633 (C.A.5 2014). This Court granted certiorari for a second time, 576 U.S. ----, 135 S.Ct. 2888, 192 L.Ed.2d 923 (2015), and now affirms.
II
Fisher I set forth three controlling principles relevant to assessing the *2208 constitutionality of a public university's affirmative-action program. First, "because racial characteristics so seldom provide a relevant basis for disparate treatment," Richmond v. J.A. Croson Co., 488 U.S. 469, 505, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), "[r]ace may not be considered [by a university] unless the admissions process can withstand strict scrutiny," Fisher I, 570 U.S., at ----, 133 S.Ct., at 2418. Strict scrutiny requires the university to demonstrate with clarity that its " 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary ... to the accomplishment of its purpose.' " Ibid.
Second, Fisher I confirmed that "the decision to pursue 'the educational benefits that flow from student body diversity' ... is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper." Id., at ----, 133 S.Ct., at 2419. A university cannot impose a fixed quota or otherwise "define diversity as 'some specified percentage of a particular group merely because of its race or ethnic origin.' " Ibid. Once, however, a university gives "a reasoned, principled explanation" for its decision, deference must be given "to the University's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals." Ibid. (internal quotation marks and citation omitted).
Third, Fisher I clarified that no deference is owed when determining whether the use of race is narrowly tailored to achieve the university's permissible goals. Id., at ----, 133 S.Ct., at 2419-2420. A university, Fisher I explained, bears the burden of proving a "nonracial approach" would not promote its interest in the educational benefits of diversity "about as well and at tolerable administrative expense." Id., at ----, 133 S.Ct., at 2420 (internal quotation marks omitted). Though "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative" or "require a university to choose between maintaining a reputation for excellence [and] fulfilling a commitment to provide educational opportunities to members of all racial groups," Grutter, 539 U.S., at 339, 123 S.Ct. 2325 it does impose "on the university the ultimate burden of demonstrating" that "race-neutral alternatives" that are both "available" and "workable" "do not suffice." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2420.
Fisher I set forth these controlling principles, while taking no position on the constitutionality of the admissions program at issue in this case. The Court held only that the District Court and the Court of Appeals had "confined the strict scrutiny inquiry in too narrow a way by deferring to the University's good faith in its use of racial classifications." Id., at ----, 133 S.Ct., at 2421 The Court remanded the case, with instructions to evaluate the record under the correct standard and to determine whether the University had made "a showing that its plan is narrowly tailored to achieve" the educational benefits that flow from diversity. Id., at ----, 133 S.Ct., at 2421. On remand, the Court of Appeals determined that the program conformed with the strict scrutiny mandated by Fisher I . See 758 F.3d, at 659-660. Judge Garza dissented.
III
The University's program is sui generis . Unlike other approaches to college admissions considered by this Court, it combines holistic review with a percentage plan. This approach gave rise to an unusual consequence in this case: The component of the University's admissions policy that had the largest impact on petitioner's *2209 chances of admission was not the school's consideration of race under its holistic-review process but rather the Top Ten Percent Plan. Because petitioner did not graduate in the top 10 percent of her high school class, she was categorically ineligible for more than three-fourths of the slots in the incoming freshman class. It seems quite plausible, then, to think that petitioner would have had a better chance of being admitted to the University if the school used race-conscious holistic review to select its entire incoming class, as was the case in Grutter .
Despite the Top Ten Percent Plan's outsized effect on petitioner's chances of admission, she has not challenged it. For that reason, throughout this litigation, the Top Ten Percent Plan has been taken, somewhat artificially, as a given premise.
Petitioner's acceptance of the Top Ten Percent Plan complicates this Court's review. In particular, it has led to a record that is almost devoid of information about the students who secured admission to the University through the Plan. The Court thus cannot know how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review.
In an ordinary case, this evidentiary gap perhaps could be filled by a remand to the district court for further factfinding. When petitioner's application was rejected, however, the University's combined percentage-plan/holistic-review approach to admission had been in effect for just three years. While studies undertaken over the eight years since then may be of significant value in determining the constitutionality of the University's current admissions policy, that evidence has little bearing on whether petitioner received equal treatment when her application was rejected in 2008. If the Court were to remand, therefore, further factfinding would be limited to a narrow 3-year sample, review of which might yield little insight.
Furthermore, as discussed above, the University lacks any authority to alter the role of the Top Ten Percent Plan in its admissions process. The Plan was mandated by the Texas Legislature in the wake of Hopwood, so the University, like petitioner in this litigation, has likely taken the Plan as a given since its implementation in 1998. If the University had no reason to think that it could deviate from the Top Ten Percent Plan, it similarly had no reason to keep extensive data on the Plan or the students admitted under it-particularly in the years before Fisher I clarified the stringency of the strict-scrutiny burden for a school that employs race-conscious review.
Under the circumstances of this case, then, a remand would do nothing more than prolong a suit that has already persisted for eight years and cost the parties on both sides significant resources. Petitioner long since has graduated from another college, and the University's policy-and the data on which it first was based-may have evolved or changed in material ways.
The fact that this case has been litigated on a somewhat artificial basis, furthermore, may limit its value for prospective guidance. The Texas Legislature, in enacting the Top Ten Percent Plan, cannot much be criticized, for it was responding to Hopwood, which at the time was binding law in the State of Texas. That legislative response, in turn, circumscribed the University's discretion in crafting its admissions policy. These circumstances refute any criticism that the University did not make good-faith efforts to comply with the law.
That does not diminish, however, the University's continuing obligation to *2210 satisfy the burden of strict scrutiny in light of changing circumstances. The University engages in periodic reassessment of the constitutionality, and efficacy, of its admissions program. See Supp. App. 32a; App. 448a. Going forward, that assessment must be undertaken in light of the experience the school has accumulated and the data it has gathered since the adoption of its admissions plan.
As the University examines this data, it should remain mindful that diversity takes many forms. Formalistic racial classifications may sometimes fail to capture diversity in all of its dimensions and, when used in a divisive manner, could undermine the educational benefits the University values. Through regular evaluation of data and consideration of student experience, the University must tailor its approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest. The University's examination of the data it has acquired in the years since petitioner's application, for these reasons, must proceed with full respect for the constraints imposed by the Equal Protection Clause. The type of data collected, and the manner in which it is considered, will have a significant bearing on how the University must shape its admissions policy to satisfy strict scrutiny in the years to come. Here, however, the Court is necessarily limited to the narrow question before it: whether, drawing all reasonable inferences in her favor, petitioner has shown by a preponderance of the evidence that she was denied equal treatment at the time her application was rejected.
IV
In seeking to reverse the judgment of the Court of Appeals, petitioner makes four arguments. First, she argues that the University has not articulated its compelling interest with sufficient clarity. According to petitioner, the University must set forth more precisely the level of minority enrollment that would constitute a "critical mass." Without a clearer sense of what the University's ultimate goal is, petitioner argues, a reviewing court cannot assess whether the University's admissions program is narrowly tailored to that goal.
As this Court's cases have made clear, however, the compelling interest that justifies consideration of race in college admissions is not an interest in enrolling a certain number of minority students. Rather, a university may institute a race-conscious admissions program as a means of obtaining "the educational benefits that flow from student body diversity." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2419 (internal quotation marks omitted); see also Grutter, 539 U.S., at 328, 123 S.Ct. 2325. As this Court has said, enrolling a diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races." Id., at 330, 123 S.Ct. 2325 (internal quotation marks and alteration omitted). Equally important, "student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society." Ibid . (internal quotation marks omitted).
Increasing minority enrollment may be instrumental to these educational benefits, but it is not, as petitioner seems to suggest, a goal that can or should be reduced to pure numbers. Indeed, since the University is prohibited from seeking a particular number or quota of minority students, it cannot be faulted for failing to specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained.
*2211 On the other hand, asserting an interest in the educational benefits of diversity writ large is insufficient. A university's goals cannot be elusory or amorphous-they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them.
The record reveals that in first setting forth its current admissions policy, the University articulated concrete and precise goals. On the first page of its 2004 "Proposal to Consider Race and Ethnicity in Admissions," the University identifies the educational values it seeks to realize through its admissions process: the destruction of stereotypes, the " 'promot[ion of] cross-racial understanding,' " the preparation of a student body " 'for an increasingly diverse workforce and society,' " and the " 'cultivat[ion of] a set of leaders with legitimacy in the eyes of the citizenry.' " Supp. App. 1a; see also id., at 69a; App. 314a-315a (deposition of N. Bruce Walker (Walker Dep.)), 478a-479a (Walker Aff. ¶ 4) (setting forth the same goals). Later in the proposal, the University explains that it strives to provide an "academic environment" that offers a "robust exchange of ideas, exposure to differing cultures, preparation for the challenges of an increasingly diverse workforce, and acquisition of competencies required of future leaders." Supp. App. 23a. All of these objectives, as a general matter, mirror the "compelling interest" this Court has approved in its prior cases.
The University has provided in addition a "reasoned, principled explanation" for its decision to pursue these goals. Fisher I, supra, at ----, 133 S.Ct., at 2419. The University's 39-page proposal was written following a year-long study, which concluded that "[t]he use of race-neutral policies and programs ha[d] not been successful" in "provid[ing] an educational setting that fosters cross-racial understanding, provid[ing] enlightened discussion and learning, [or] prepar[ing] students to function in an increasingly diverse workforce and society." Supp. App. 25a; see also App. 481a-482a (Walker Aff. ¶¶ 8-12) (describing the "thoughtful review" the University undertook when it faced the "important decision ... whether or not to use race in its admissions process"). Further support for the University's conclusion can be found in the depositions and affidavits from various admissions officers, all of whom articulate the same, consistent "reasoned, principled explanation." See, e.g., id., at 253a (Ishop Dep.), 314a-318a, 359a (Walker Dep.), 415a-416a (Defendant's Statement of Facts), 478a-479a, 481a-482a (Walker Aff. ¶¶ 4, 10-13). Petitioner's contention that the University's goal was insufficiently concrete is rebutted by the record.
Second, petitioner argues that the University has no need to consider race because it had already "achieved critical mass" by 2003 using the Top Ten Percent Plan and race-neutral holistic review. Brief for Petitioner 46. Petitioner is correct that a university bears a heavy burden in showing that it had not obtained the educational benefits of diversity before it turned to a race-conscious plan. The record reveals, however, that, at the time of petitioner's application, the University could not be faulted on this score. Before changing its policy the University conducted "months of study and deliberation, including retreats, interviews, [and] review of data," App. 446a, and concluded that "[t]he use of race-neutral policies and programs ha[d] not been successful in achieving" sufficient racial diversity at the University, Supp. App. 25a. At no stage in this litigation has petitioner challenged the University's good faith in conducting its studies, and the Court properly declines to consider the extrarecord materials the dissent relies upon, many of which are tangential *2212 to this case at best and none of which the University has had a full opportunity to respond to. See, e.g., post, at 2240 (opinion of ALITO, J.) (describing a 2015 report regarding the admission of applicants who are related to "politically connected individuals").
The record itself contains significant evidence, both statistical and anecdotal, in support of the University's position. To start, the demographic data the University has submitted show consistent stagnation in terms of the percentage of minority students enrolling at the University from 1996 to 2002. In 1996, for example, 266 African-American freshmen enrolled, a total that constituted 4.1 percent of the incoming class. In 2003, the year Grutter was decided, 267 African-American students enrolled-again, 4.1 percent of the incoming class. The numbers for Hispanic and Asian-American students tell a similar story. See Supp. App. 43a. Although demographics alone are by no means dispositive, they do have some value as a gauge of the University's ability to enroll students who can offer underrepresented perspectives.
In addition to this broad demographic data, the University put forward evidence that minority students admitted under the Hopwood regime experienced feelings of loneliness and isolation. See, e.g., App. 317a-318a.
This anecdotal evidence is, in turn, bolstered by further, more nuanced quantitative data. In 2002, 52 percent of undergraduate classes with at least five students had no African-American students enrolled in them, and 27 percent had only one African-American student. Supp. App. 140a. In other words, only 21 percent of undergraduate classes with five or more students in them had more than one African-American student enrolled. Twelve percent of these classes had no Hispanic students, as compared to 10 percent in 1996. Id., at 74a, 140a. Though a college must continually reassess its need for race-conscious review, here that assessment appears to have been done with care, and a reasonable determination was made that the University had not yet attained its goals.
Third, petitioner argues that considering race was not necessary because such consideration has had only a " 'minimal impact' in advancing the [University's] compelling interest." Brief for Petitioner 46; see also Tr. of Oral Arg. 23:10-12; 24:13-25:2, 25:24-26:3. Again, the record does not support this assertion. In 2003, 11 percent of the Texas residents enrolled through holistic review were Hispanic and 3.5 percent were African-American. Supp. App. 157a. In 2007, by contrast, 16.9 percent of the Texas holistic-review freshmen were Hispanic and 6.8 percent were African-American. Ibid. Those increases-of 54 percent and 94 percent, respectively-show that consideration of race has had a meaningful, if still limited, effect on the diversity of the University's freshman class.
In any event, it is not a failure of narrow tailoring for the impact of racial consideration to be minor. The fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality.
Petitioner's final argument is that "there are numerous other available race-neutral means of achieving" the University's compelling interest. Brief for Petitioner 47. A review of the record reveals, however, that, at the time of petitioner's application, none of her proposed alternatives was a workable means for the University to attain the benefits of diversity it sought. For example, petitioner suggests *2213 that the University could intensify its outreach efforts to African-American and Hispanic applicants. But the University submitted extensive evidence of the many ways in which it already had intensified its outreach efforts to those students. The University has created three new scholarship programs, opened new regional admissions centers, increased its recruitment budget by half-a-million dollars, and organized over 1,000 recruitment events. Supp. App. 29a-32a; App. 450a-452a (citing affidavit of Michael Orr ¶¶ 4-20). Perhaps more significantly, in the wake of Hopwood, the University spent seven years attempting to achieve its compelling interest using race-neutral holistic review. None of these efforts succeeded, and petitioner fails to offer any meaningful way in which the University could have improved upon them at the time of her application.
Petitioner also suggests altering the weight given to academic and socioeconomic factors in the University's admissions calculus. This proposal ignores the fact that the University tried, and failed, to increase diversity through enhanced consideration of socioeconomic and other factors. And it further ignores this Court's precedent making clear that the Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence. Grutter, 539 U.S., at 339, 123 S.Ct. 2325.
Petitioner's final suggestion is to uncap the Top Ten Percent Plan, and admit more-if not all-the University's students through a percentage plan. As an initial matter, petitioner overlooks the fact that the Top Ten Percent Plan, though facially neutral, cannot be understood apart from its basic purpose, which is to boost minority enrollment. Percentage plans are "adopted with racially segregated neighborhoods and schools front and center stage." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2433 (GINSBURG, J., dissenting). "It is race consciousness, not blindness to race, that drives such plans." Ibid. Consequently, petitioner cannot assert simply that increasing the University's reliance on a percentage plan would make its admissions policy more race neutral.
Even if, as a matter of raw numbers, minority enrollment would increase under such a regime, petitioner would be hard-pressed to find convincing support for the proposition that college admissions would be improved if they were a function of class rank alone. That approach would sacrifice all other aspects of diversity in pursuit of enrolling a higher number of minority students. A system that selected every student through class rank alone would exclude the star athlete or musician whose grades suffered because of daily practices and training. It would exclude a talented young biologist who struggled to maintain above-average grades in humanities classes. And it would exclude a student whose freshman-year grades were poor because of a family crisis but who got herself back on track in her last three years of school, only to find herself just outside of the top decile of her class.
These are but examples of the general problem. Class rank is a single metric, and like any single metric, it will capture certain types of people and miss others. This does not imply that students admitted through holistic review are necessarily more capable or more desirable than those admitted through the Top Ten Percent Plan. It merely reflects the fact that privileging one characteristic above all others does not lead to a diverse student body. Indeed, to compel universities to admit students based on class rank alone is in deep tension with the goal of educational diversity as this Court's cases have defined *2214 it. See Grutter, supra, at 340, 123 S.Ct. 2325 (explaining that percentage plans "may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university"); 758 F.3d, at 653 (pointing out that the Top Ten Percent Law leaves out students "who fell outside their high school's top ten percent but excelled in unique ways that would enrich the diversity of [the University's] educational experience" and "leaves a gap in an admissions process seeking to create the multi-dimensional diversity that [Regents of Univ. of Cal . v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978),] envisions"). At its center, the Top Ten Percent Plan is a blunt instrument that may well compromise the University's own definition of the diversity it seeks.
In addition to these fundamental problems, an admissions policy that relies exclusively on class rank creates perverse incentives for applicants. Percentage plans "encourage parents to keep their children in low-performing segregated schools, and discourage students from taking challenging classes that might lower their grade point averages." Gratz, 539 U.S., at 304, n. 10, 123 S.Ct. 2411 (GINSBURG, J., dissenting).
For all these reasons, although it may be true that the Top Ten Percent Plan in some instances may provide a path out of poverty for those who excel at schools lacking in resources, the Plan cannot serve as the admissions solution that petitioner suggests. Wherever the balance between percentage plans and holistic review should rest, an effective admissions policy cannot prescribe, realistically, the exclusive use of a percentage plan.
In short, none of petitioner's suggested alternatives-nor other proposals considered or discussed in the course of this litigation-have been shown to be "available" and "workable" means through which the University could have met its educational goals, as it understood and defined them in 2008. Fisher I, supra, at ----, 133 S.Ct., at 2420. The University has thus met its burden of showing that the admissions policy it used at the time it rejected petitioner's application was narrowly tailored.
* * *
A university is in large part defined by those intangible "qualities which are incapable of objective measurement but which make for greatness." Sweatt v. Painter, 339 U.S. 629, 634, 70 S.Ct. 848, 94 L.Ed. 1114 (1950). Considerable deference is owed to a university in defining those intangible characteristics, like student body diversity, that are central to its identity and educational mission. But still, it remains an enduring challenge to our Nation's education system to reconcile the pursuit of diversity with the constitutional promise of equal treatment and dignity.
In striking this sensitive balance, public universities, like the States themselves, can serve as "laboratories for experimentation." United States v. Lopez, 514 U.S. 549, 581, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (KENNEDY, J., concurring); see also New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). The University of Texas at Austin has a special opportunity to learn and to teach. The University now has at its disposal valuable data about the manner in which different approaches to admissions may foster diversity or instead dilute it. The University must continue to use this data to scrutinize the fairness of its admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy; and to identify *2215 the effects, both positive and negative, of the affirmative-action measures it deems necessary.
The Court's affirmance of the University's admissions policy today does not necessarily mean the University may rely on that same policy without refinement. It is the University's ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies.
The judgment of the Court of Appeals is affirmed.
It is so ordered.
Justice KAGAN took no part in the consideration or decision of this case.