# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 14, 2017       Decided August 10, 2018

No. 16-5236

BRETT STEELE,
APPELLANT

v.

JAMES MATTIS, SECRETARY OF DEFENSE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01229)

*Donna Williams Rucker* argued the cause and filed the briefs for appellant.

*Peter C. Pfaffenroth*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu,* U.S. Attorney, *Shanna L. Cronin*, Special Assistant U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Derrick W. Grace*, Special Assistant U.S. Attorney, entered an appearance.

Before: GRIFFITH, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The Department of Defense hired Dr. Brett Steele to teach at the National Defense University's College of International Security Affairs. During his probationary first year of instruction, the College decided to terminate his contract. Dr. Steele filed suit, asserting that his contract was ended because of his age. The district court granted summary judgment to the Department of Defense. Because the Department has failed to provide a consistent and sufficient explanation for Dr. Steele's discharge, and because Dr. Steele has come forward with evidence that a supervisor directly involved in the decisionmaking process made repeated discriminatory remarks, we reverse the district court's grant of summary judgment and remand for further proceedings.

**I**

**A**

As applied to the federal government, the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, requires that "[a]ll personnel actions affecting [federal] employees or applicants for employment who are at least 40 years of age * * * shall be made free from any discrimination based on age," *id.* § 633a(a). The Act's protection includes employees in "military departments." *Id.* Congress enacted the ADEA to protect older individuals "from arbitrary and stereotypical employment distinctions[.]" *General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 587 (2004).

To establish a disparate treatment claim under the ADEA, a plaintiff can rely on direct evidence of discriminatory intent, as well as indirect evidence from which a discriminatory motive for the employment decision could be inferred. For the

latter, a plaintiff can state a *prima facie* case of age discrimination in a termination decision by coming forward with evidence showing that he (i) was 40 or older, and so falls within the ADEA's protective reach; (ii) was otherwise qualified for the position in which he was working; (iii) was terminated; and (iv) was replaced by someone younger. *Paquin v. Federal Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997); *see Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). Once a plaintiff makes that showing, the burden of production shifts to the employer to come forward with a "legitimate non-discriminatory reason" for the discharge. *DeJesus v. WP Company*, 841 F.3d 527, 532 (D.C. Cir. 2016). If the employer does so, the burden-shifting paradigm disappears, and the "sole remaining issue [i]s discrimination *vel non*." *Reeves*, 530 U.S. at 143 (internal quotation marks and citation omitted). At all times, the plaintiff bears the burden of proving that age discrimination occurred. To obtain reinstatement or backpay, the plaintiff must show that age discrimination was the but-for cause of the discharge. *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 177–178 (2009); *Reeves*, 530 U.S. at 143. In litigation against federal governmental defendants under 29 U.S.C. § 633a, the plaintiff may obtain "declaratory and possibly injunctive relief" only if he proves that age was "a factor" in the discharge. *Ford v. Mabus*, 629 F.3d 198, 207 (D.C. Cir. 2007).

**B**

In August 2010, the Department of Defense hired Dr. Brett Steele to serve as an associate professor at the National Defense University's College of International Security Affairs. The College is a Department component that offers educational programs for professionals on interagency and international security matters. Dr. Steele was 47 years old when he was

hired. The Department hired him for a three-year term, but the first year was probationary.

Halfway through his probationary year, a dispute arose between Dr. Steele and his supervisors, including Dean Querine Hanlon and Dr. Alejandra Bolanos, over Dr. Steele's teaching methods and curriculum decisions. In particular, the supervisors expressed concern that he strayed from the required syllabus and used an "unapproved concept" in teaching one of his subjects. *Steele v. Carter*, 192 F. Supp. 3d 151, 159 (D.D.C. 2016). Dr. Steele met with Dean Hanlon and Dr. Bolanos and agreed to bring his instructional methods into conformity. Within roughly a month, supervisors' complaints about Dr. Steele's teaching resurfaced, and led to a "heated" "academic debate" between Dr. Steele, Dean Hanlon, Dr. Bolanos, and the College's Chancellor. *Id.* at 160.

Around that same time, the College was hit with budgetary cuts. After its request for a waiver of the funding losses was denied, the College decided that it would have to terminate three faculty positions, and that it would choose them only from among its six probationary faculty. In May 2011, the College made the decision to terminate Dr. Steele, Dr. Art Westneat, and Seth Malaguerra, effective three months later at the end of the summer semester. According to Dr. Steele, he was never informed of the reason for his termination. Dr. Steele later resigned on the eve of his termination date to avoid "getting the horrible black mark of being terminated from a Government position" and in the hope of obtaining other employment opportunities in the future. J.A. 729.

According to evidence put forward by Dr. Steele, Dr. Bolanos had made comments directly to him stating that young colleagues "are such a breath of fresh air," "eager to please," and the "kind of * * * people who are making [the College]

marvelous," while older employees are "stubborn" and "difficult to work with." J.A. 264, 881. Dr. Steele further alleged that Dr. Bolanos told him that the College had become "much better" because "all these younger people" were hired. J.A. 173. Dr. Bolanos denied making those statements. *Steele*, 192 F. Supp. 3d at 165.

During the Fall semester, three other faculty members took over Dr. Steele's teaching responsibilities. One of them was under 40 years of age at the time; the other two were over 40. Shortly after his termination, the College hired two new associate professors, both of whom were under the age of 40. They each taught different subjects than Dr. Steele had. Within a year of Dr. Steele's discharge, the College brought on board a third younger professor who took over the teaching of most of Dr. Steele's courses. J.A. 171–172, 798.

## C

In July 2011, Dr. Steele filed an informal equal employment opportunity complaint with the Department alleging that he was being improperly terminated because of his age. When that complaint was not resolved favorably, Dr. Steele filed a formal complaint with the Department of Defense's equal employment opportunity office in November 2011. Eighteen months later, the Department denied his complaint.

Dr. Steele then filed suit in the United States District Court for the District of Columbia, alleging unlawful age discrimination, retaliation for exercising his statutory rights, a hostile work environment based on his age, and constructive discharge, all in violation of the ADEA.

The district court granted summary judgment for the government. The district court first concluded that Dr. Steele failed to provide any direct evidence of age discrimination, concluding that the comments Dr. Bolanos made were just "stray remarks," and were not relevant because Dr. Bolanos did not make the actual termination decision. The court also found insufficient indirect evidence of age discrimination, concluding that the government had offered a legitimate, lawful explanation for Dr. Steele's termination—budgetary cuts—and that Dr. Steele had failed to show that the government's explanation was pretextual. Finally, the district court dismissed Dr. Steele's claims of retaliation and hostile work environment on the ground that they were unsupported by relevant evidence.[1]

**II**

We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291. We review the district court's grant of summary judgment *de novo.* On summary judgment, the court may neither "make credibility determinations [nor] weigh the evidence." *DeJesus*, 841 F.3d at 531 (quotation marks omitted). Instead, summary judgment is proper only when, "viewing the evidence in the light most favorable to [the plaintiff] and drawing all reasonable inferences accordingly," "no reasonable jury could find in [the plaintiff's] favor." *Evans v. Sibelius*, 716 F.3d 617, 619 (D.C. Cir. 2013).

Looking at the record as a whole, the district court erred in holding that, as a matter of law, no reasonable jury could disbelieve the government's proffered explanation for the

---

[1] Dr. Steele has not challenged the dismissal of his retaliation or hostile work environment claims on appeal.

discharge and rule in Dr. Steele's favor. Dr. Steele came forward with evidence both discrediting the government's asserted basis for its decision and supporting a reasonable inference of discriminatory motivation. That is not to say that Dr. Steele will necessarily prevail. At the summary judgment stage, we hold only that Dr. Steele has created genuinely disputed facts that are material to the question of whether age was the true reason for his discharge. Which side of that factual dispute is correct is for a jury to decide.

**A**

The district court held, and the Department does not dispute, that Dr. Steele made out a *prima facie* case of age discrimination. *Steele*, 192 F. Supp. 3d at 167; Government Br. at 13. We need not decide whether Dr. Steele adequately made out a *prima facie* case because the Department proffered a legitimate nondiscriminatory reason for the termination—the required budget cuts. If credited by a jury, the termination of a government employee based on budgetary constraints can qualify as a legitimate, nondiscriminatory reason for a discharge. *Durant v. District of Columbia Government*, 875 F.3d 685, 698–699 (D.C. Cir. 2017); *see Samii v. Billington*, 195 F.3d 1, 3 (D.C. Cir. 1999) (same, for other types of adverse personnel actions). Dr. Steele, for his part, does not dispute that budget cuts were afoot, and acknowledges that the continuation of his position was predicated on adequate funding.

Given that the government met its burden of coming forward with a nondiscriminatory reason for the discharge, we "skip ahead to the third step in the test" and ask whether the plaintiff has come forward with a sufficient evidentiary basis on which a reasonable juror could find that age discrimination caused or was a factor in the discharge. *Wheeler v.*

*Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016); *Ford*, 629 F.3d at 207 (noting that "a factor" standard applies to declaratory and perhaps injunctive relief against federal governmental defendants). Indeed, under those circumstances, the district court "need not—*and should not—*decide whether the plaintiff actually made out a prima facie case[.]" *Wheeler*, 812 F.3d at 1114 (quoting *Brady v. Office of the Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008)). The exclusive focus of the analysis is "discrimination *vel non*." *Reeves*, 530 U.S. at 143 (internal quotation marks and citation omitted). To be sure, the evidence that the plaintiff gathered in support of his *prima facie* case, and reasonable inferences drawn from it, may still be considered in evaluating whether the summary judgment standard has been met. But the legal question of whether a *prima facie* case was made out is no longer relevant. *Id*.

**B**

When confronted with evidence of a legitimate nondiscriminatory reason for the employer's challenged action, the plaintiff, as part of his ultimate burden of persuasion, must come forward with evidence that would allow a jury to credit his evidence of age discrimination and discredit the employer's seemingly nondiscriminatory motivation. That may be done either "indirectly by showing the employer's reason is pretextual or directly by showing that it was more likely than not that the employer was motivated by discrimination." *Forman v. Small*, 271 F.3d 285, 292 (D.C. Cir. 2001); *see Reeves*, 530 U.S. at 143. Dr. Steele came forward with substantial evidence that undermined as pretextual the government's asserted explanation for his termination and that could allow a reasonable jury to find that age was the but-for cause of his discharge.

9

*First*, the district court committed legal error at the outset by holding that the College was "to be given heightened deference," so that Dr. Steele faced an "even heavier burden of showing pretext than usual." *Steele*, 192 F. Supp. 3d at 168. In the absence of a determination that the case involves a distinctly academic judgment of the type for which courts have found deference warranted, nothing in the ADEA supports the automatic imposition of a heightened pretext burden just because the defendant is an academic institution.

Deference may well be appropriate when the question before the court turns on the merits of an academic disagreement or a plaintiff's substantive qualifications for the position. *See, e.g.*, *Fisher v. University of Texas*, 136 S. Ct. 2198, 2208 (2016) ("some" judicial deference owed to academic judgment about the benefits of diversity in the educational setting); *Regents of Univ. of Michigan v. Ewing¸* 474 U.S. 214, 225 (1985) (where plaintiff did not allege any "nonacademic or constitutionally impermissible reasons for expelling" him, court was reluctant to second-guess the University's "genuinely academic decision" evaluating the student's "academic career"); *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89–90 (1978) (Due Process Clause does not require a hearing to review "[a]cademic evaluations" and judgments about whether a student met academic standards before dismissal from an educational institution); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92-93 (2d Cir. 1984) (noting need for deference to substantive judgments about academic performance in "tenure" decisions).

It is not clear that the College in this case rested its termination decision on such a "genuinely academic decision." *Ewing*, 474 U.S at 225. The College has not argued that its decision to terminate Dr. Steele's contract was rooted in the type of substantive academic evaluation of his scholarship that

courts are ill-equipped to second guess. The College's central position, instead, has been that Steele was terminated for budgetary reasons or, perhaps, deviations from a prescribed syllabus by a contract employee. But even if we were to give some degree of deference to the College's decision about who was best qualified to teach the courses it had determined best fit its "mission needs," Government Br. at 10, Dr. Steele has produced enough evidence to create a triable issue of fact that age played a role in his termination.

*Second*, a reasonable juror could disbelieve the College's stated budgetary rationale because it was both insufficient and inconsistent. It was insufficient because, while the budget reductions seemingly necessitated the termination of three faculty members, that does not explain why Dr. Steele was one of those whose job was chosen for the chopping block. In other words, the College came forward with a legitimate, nondiscriminatory rationale for firing *someone*, but not for firing *Dr. Steele* rather than another probationary faculty member.

In the absence of an individualized explanation for why or how Dr. Steele was chosen, jurors could sensibly conclude that the College's story comes up short. To jurors, the College's proffered rationale could ring especially hollow when combined with the refusal of the Dean and other supervisors to tell Dr. Steele at the time of his termination why he had been targeted. *See* J.A. 153, 255, 607–608, 747. If the budget made the College do it, why hide that reason from Dr. Steele?

What is more, Dr. Steele identified two probationary employees who were substantially younger than he was—Hans Ucko and Paul Miller—who were untouched by the budget cuts. While, as the district court noted, Ucko and Miller had different backgrounds and experience than Dr. Steele, *Steele*,

192 F. Supp. 3d at 171–172, that is to be expected in a faculty teaching a variety of subjects. The College does not dispute that Dr. Steele himself brought his own special experience and skills to bear, so much so that the College had pursued him for years and had an "urgent need" for the strategic thought course he taught. J.A. 707; *id*. ("[T]hey desperately needed to get this course taught[.]"); *id.* at 707–708 (Dr. Steele "rejected the offer" first proposed to him, and the College then returned with "another job offer"); *id* at 74–75 (same); *id.* at 708–709 (Dr. Steele was told he was hired because of his "substantive engineering background," his ability to "do a better job in appealing to [] students" given his particular background, and thus accordingly was instructed to use his "full creative powers as an engineer and [and his] experience and insights into the mindset of engineers" to appeal to those students).

In addition, the record shows that "[l]ast minute reductions across [the College] enabled the hiring of two faculty members" who were significantly younger than Dr. Steele, and well under 40 years of age. J.A. 146. On top of all that, the instructor later selected to teach most of the courses Dr. Steele had taught was also materially younger than Dr. Steele. J.A. 171–172, 798.

The College was also inconsistent in its explanations. While officials kept their lips sealed at the time of the discharge decision, during the equal employment opportunity grievance process, evidence surfaced indicating that Dr. Steele might have been fired because of his performance, not due to budget cuts. The Chancellor referred to Dr. Steele as a "very irresponsible professor," *Steele*, 192 F. Supp. 3d at 173, and there was no dispute that there had been contentious and heated debates about his teaching methods shortly before his discharge, *id.* at 160; *see also* J.A. 149–150, 207–208. Dr. Bolanos added that "a decision [was] made that maybe [Dr.

Steele] was possibly not the best match for the organization." *Steele*, 192 F. Supp. 3d at 173.

Given all of that, a reasonable jury could conclude that the College's explanation for Dr. Steele's termination has been a moving target, evolving from unexplained silence, to performance-based complaints, to an insistence that the budget and *definitely not* Dr. Steele's performance issues drove the decision, even though the budget cuts alone cannot explain why Dr. Steele himself was fired.[2] Those inconsistencies and insufficiencies, especially when combined with Dr. Steele's replacement by a younger worker, could spark reasonable disbelief.

*Third*, on top of the variability in explanations for the termination, Dr. Steele came forward with direct evidence of age discrimination on the part of a potentially influential participant in the termination decision. Dr. Steele alleges that his first-level supervisor, Dr. Bolanos made a number of statements disparaging older workers and favoring younger ones. Specifically, according to Dr. Steele, Dr. Bolanos told him that older employees are "stubborn," "difficult to work with," and "cantankerous." J.A. 259, 264, 709. Dr. Bolanos also allegedly "pointed to a particular older person as a case study in why it's not good to have lots of older employees at [the College]." J.A. 261. At the same time, Dr. Bolanos effused that "young people are such a breath of fresh air," "eager to please," "work hard," are "enthusiastic," and are the "kind of young people who are making [the College] marvelous." J.A. 264, 709. Dr. Bolanos also told Dr. Steele that the College had become "much better" because "all these

---

[2] By page 31 of its brief in this court, the Department has come to describe the termination decision as based on both "budgetary considerations and the qualifications of the competing candidates."

younger people" were hired. J.A. 173. To be sure, Dr. Bolanos denied making those statements. J.A. 882. But at the summary judgment stage, that "he said, she said" credibility determination must be resolved in favor of Dr. Steele. So we, like the district court, assume that Dr. Bolanos made those statements for purposes of resolving this appeal. *See Steele*, 192 F. Supp. 3d at 164; *see also Chenari v. George Washington Univ. Hospital*, 847 F.3d 740, 747 (D.C. Cir. 2017); *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016).

The College backhands those comments as "stray remark[s]" and "unrelated" to Dr. Steele's termination because Dr. Bolanos did not have a "role in making the removal decision." Government Br. at 31. The district court agreed. *Steele*, 192 F. Supp. 3d at 166. That was wrong on both fronts.

To start, the law is settled that an employer's liability for the discriminatory acts of its agents goes beyond the final decisionmaker—the person actually making the hiring or firing decision. The actions of a discriminatory supervisor that feed into and causally influence the decisionmaker's ultimate determination may also be the proximate cause of an adverse employment action. *Staub v. Proctor Hospital*, 562 U.S. 411, 419–423 (2011); *see id*. at 422 ("[I]f a supervisor" acting within the scope of employment "performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the

employer is liable[.]").[3]  This is commonly known as the "cat's paw" theory of liability.[4]

Dr. Bolanos was Dr. Steele's immediate supervisor, J.A. 13, and admits to being present at the meeting and "in those discussions" where the decision to terminate Dr. Steele was made.  J.A. 745 (Dr. Bolanos testifying that "there was feedback given to my leadership * * * with several concerns" about Dr. Steele, "and at some point, there was a decision made that maybe Dr. Steele was possibly not the best match for the organization.  I basically was present in those discussions."). Dr. Bolanos went on to acknowledge that, regarding Dr. Steele's termination, she "was involved, not necessarily in decision, but yes, in discussion of issues that may be connected to that, yes." *Id.*  Because Dr. Bolanos was the front-line supervisor and was "in the discussions" and meetings about

---

[3] *See also Forman*, 271 F.3d at 293 (holding in ADEA case that, when "those who have input into the [employment] decision [] express such discriminatory feelings around the relevant time in regard to the adverse employment action complained of, then it may be possible to infer that the decision makers were influenced by those feelings in making their decisions") (citation omitted); *see also Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015) (A "supervisor's biased report may remain a causal factor" if the "ultimate decision maker[]" takes it into account.) (quotation marks omitted).

[4] The phrase "cat's paw" derives from an Aesop fable in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire" and, "[a]fter the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub*, 562 U.S. at 415 n.1.  A person motivated by proscribed bias, who has decisive input into an adverse employment action, is the monkey behind the paw of the ultimate decisionmaker that does the deed.

termination, *id.*, the summary judgment record raised a material factual dispute about cat's paw causation concerning Dr. Steele's termination.

Nor can Dr. Bolanos's offensive remarks about older workers be brushed off as "stray" and immaterial. Quite the opposite, a few months before the first adverse reports on Dr. Steele's work, Dr. Bolanos allegedly gave voice to the very type of "arbitrary" stereotypes and prejudices about older workers' abilities that Congress enacted the ADEA to halt. *See* 29 U.S.C. § 621(a)(2) & (b) (Congressional statement of findings and purpose). Had similar statements been made about workers based on their race or gender—claiming that they are "difficult to work with," and that "it's not good to have lots of [them] at [the College]"—the comments no doubt would have been treated as disturbing and powerful evidence of discrimination. J.A. 261, 709. So too for the ADEA. Crediting Dr. Steele's evidence as true, Dr. Bolanos's open hostility to older workers should have been recognized for what it is—direct evidence of illegal discrimination, not harmless "stray remark[s]." *Steele*, 192 F. Supp. 3d at 175.

\* \* \* \* \*

The question at this procedural juncture is not which of the competing explanations for Dr. Steele's termination is correct. A reasonable jury might well credit the College's budgetary or competence rationales if proven, or even find that performance issues informed the decision of which probationary professors to let go during the budgetary winnowing. Nor is the question of whose factual evidence is more credible—Dr. Steele's or the College's—before us. Our task at the summary judgment stage is more humble than that. We ask only whether, taking all of the evidence together, it would as a matter of law be irrational for jurors to disbelieve the College's assorted

rationales and to credit Dr. Steele's version of events. Looking at the record as a whole and construing the evidence, reasonable inferences, and credibility judgments in Dr. Steele's favor, we hold that a reasonable jury could credit Dr. Steele's version of events given, *inter alia*, the evidence that Dr. Steele used to support his *prima facie* case, the gaps and variations in the College's proffered explanation for the firing, Steele's ultimate replacement by a younger employee, the hiring of several other younger faculty members within the same year as Steele's budgetary termination, and the comments overtly hostile to older employees made by Dr. Steele's front-line supervisor who was directly involved in discussions about his termination.

For that reason, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

*So ordered.*